Filed 8/3/26  5110 Washington v. Scottsdale Ins. Co. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| 5110 WASHINGTON, LLC et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> SCOTTSDALE INSURANCE COMPANY, <br><br> Defendant and Respondent. | B342678 <br><br> (Los Angeles County Super. Ct. No. 23STCV08337) |

APPEAL from an order of the Superior Court of Los Angeles County, Randolph M. Hammock, Judge.  Affirmed.

Steven W. Murray; Adamski, Moroski, Madden, Cumberland & Green and Jeffrey A. Hacker for Plaintiffs and Appellants.

Gordon Rees Scully Mansukhani, Matthew G. Kleiner, and Tiffany A. Chiu for Defendant and Respondent.

\* \* \* \* \* \*

When a landlord was sued by its tenants for trying to collect rent on uninhabitable apartments, the landlord tendered defense of that lawsuit to its insurance carrier. The carrier declined to defend the suit, citing the insurance policy's explicit exclusion from coverage for "claims . . . arising out of or in any way related to [the] 'habitability' of [the] premises." After the landlord settled the lawsuit with its tenants, the landlord sued the carrier for breach of the duty to defend. The trial court dismissed the landlord's operative complaint on demurrer. This was correct, as a comparison of the tenants' complaint against the terms of the policy reveal that there is "no conceivable theory" upon which the tenants' lawsuit would not fall under the policy's habitability exclusion. (E.g., *Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 288 (*Hartford*).) We accordingly affirm.

### FACTS AND PROCEDURAL BACKGROUND

I.    **Facts**[1]

A.    *Ownership of apartment complex*

Between 2018 and 2020, 5110 Washington, LLC (5110 Washington) owned and operated a three-building apartment complex on Washington Boulevard in Los Angeles, California, and rented to more than 20 tenants.

---

1    Consistent with our standard of review, we draw our statement of facts from the allegations in the operative complaint and matters subject to judicial notice.

**B.** *Insurance policy*

5110 Washington obtained a commercial general liability policy from Scottsdale Insurance Company (Scottsdale) for coverage of its operation of the complex. As pertinent here, the policy period ran from February 27, 2018 to February 27, 2019, and was renewed for another term through February 27, 2020. 5110 Washington paid a $4,215.95 annual premium during the first period for (1) $1,000,000 in bodily injury and property damage liability coverage (Coverage A), and (2) $1,000,000 in personal and advertising injury liability coverage (Coverage B).[2] The premium for the renewal period was $9,411.07, but was for double the coverage limit (that is, $2,000,000).

1. *Coverage provisions*

During both policy periods, Scottsdale promised to (1) indemnify 5110 Washington for any "sums that the insured becomes legally obligated to pay as damages" (a) "because of 'bodily injury' or 'property damage' to which this insurance applies" or (b) "because of 'personal and advertising injury' to which this insurance applies" and (2) defend 5110 Washington "against any 'suit' seeking those damages."

For the first type of coverage—indemnity and duty to defend against damages due to "bodily injury" or "property damage"—the policy extended coverage only to "bodily injury" and "property damage" "caused by" an "occurrence" that took place on the specific premises enumerated in the policy (that is, the complex). The policy defined "bodily injury" as "bodily injury, sickness or disease"; defined "property damage" as "[p]hysical injury to tangible property" and "[l]oss of use of tangible property

---

[2] The policy also provided coverage for medical payments (Coverage C), but that coverage is not at issue here.

that is not physically injured"; and defined an "occurrence" as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions."

For the second type of coverage—indemnity and duty to defend against damages due to "personal and advertising injury"—the policy extended coverage only to (1) "personal and advertising injury," (2) that "aris[es] out of [5110 Washington's] business," and (3) that occurs on the specific premises enumerated in the policy (that is, the complex). As pertinent here, the policy defined "personal and advertising injury" as "injury, including consequential, 'bodily injury,' arising out of one or more of the following offenses":

-- "[f]alse arrest, detention or imprisonment";

-- "[m]alicious prosecution";

-- "[o]ral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services";

-- "[o]ral or written publication, in any manner, of material that violates a person's right of privacy";

-- "[t]he use of another's advertising idea in your 'advertisement,'" where "advertisement" is defined as "a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters"; and

-- "[i]nfringing upon another's copyright, trade dress or slogan in your advertisement."

Although the definition of "personal and advertising injury" in the initial part of the policy and in the endorsement limiting the policy to specified premises also included injury arising out of

4

"[t]he wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy . . . committed by or on behalf of [the] owner, landlord or lessor," a further amendment to the policy explicitly narrowed the scope of coverage and omitted that specific definition, so it is not covered.

### 2. *Habitability exclusion*

The policy also contained an endorsement modifying the two categories of coverage to *exclude* claims "arising out of or in any way related to 'habitability.'"

### a. Main exclusion

The habitability exclusion stated "[t]his insurance"—that is, the policy's duties to indemnify and to defend—"does not apply to claims or allegations for 'bodily injury,' 'property damage,' or 'personal and advertising injury' arising out of or in any way related to 'habitability' of any premises, site or location." The exclusion stated that these excluded "claims or allegations include, but are not limited to any alleged or actual violation(s) as they pertain to 'habitability' including amendments thereto," and listed, as pertinent here, violations of (1) "Civil Codes"; (2) "Rent stabilization laws and ordinances"; (3) "Any administrative rules or regulations pertaining to any of the foregoing, including, but not limited to those promulgated by local municipalities"; and (4) "Actual or constructive wrongful eviction arising from" any of the above. The exclusion defined "habitability" to mean "a living environment that is maintained in a sanitary, healthy, habitable, tenantable, livable or usable condition and is safe and/or fit for occupancy by human beings."

### b. Mixed action provision

The habitability exclusion went beyond barring coverage for indemnity and defense for "*claims or allegations . . .* arising

5

out of or in any way related to 'habitability'": It also barred coverage for indemnity and defense for "for any . . . *proceeding or 'suit'* [that was] in any way based on, attributed to, arising out of, resulting from or any manner related to" habitability—and "regardless of whether the 'habitability' allegation or claim is the proximate cause of [the] damage or injury." (Italics added.) In other words, this "mixed action" provision of the habitability exclusion barred coverage for any lawsuit that had a habitability-based claim or allegation, even if it also included non-habitability-based claims or allegations (which are sometimes called "mixed" actions).

### C. *Tenants' lawsuit*

In January 2021, numerous tenants in 5110 Washington's buildings sued 5110 Washington.[3]

The tenants' complaint alleged that the apartments they inhabited—and for which 5110 Washington was charging them rent—were plagued with "substandard" and "uninhabitable" conditions. These conditions included that the apartments' plumbing was "constantly clogged" and had pipes that "regularly leak and burst"; that the apartments lacked hot and cold running water; that the apartments lost power "due to faulty electricity"; that they had "infestations of spiders, cockroaches, mice, and other vermin"; that the apartments had "holes in the walls and ceilings and peeling paint"; that the apartments lacked operational smoke and carbon monoxide detectors; and that the apartments had "constant, pervasive smells of mold and mildew." The complaint also alleged that 5110 Washington had "illegally entered the [p]remises on numerous occasions." As a result of the

---

[3]     The tenants also sued two individuals, including the manager of 5110 Washington.

6

"habitability and other safety violations" and "harassment," plaintiffs alleged that they suffered injuries and health problems.

The complaint further alleged that the substandard habitability conditions precluded 5110 Washington from collecting—or attempting to collect—rent on the units. The complaint referenced (and attached) an April 2019 citation from the Los Angeles Department of Building and Safety issued to 5110 Washington for (1) "the unpermitted and unregistered dwelling units" at the premises as well as (2) numerous "uninhabitable conditions." The tenants' complaint also quoted a July 2020 letter from the Los Angeles Housing + Community Investment Department informing 5110 Washington that it could not, under Los Angeles's Rent Stabilization Ordinance, "demand or accept rent" without first registering the dwelling units. Despite the citation and warning, plaintiffs alleged, Washington "did nothing" to repair the premises or register the units, but continued to demand rental payments—including by sending "threatening letters" to the tenants in July, October, November, and December 2020 "falsely claiming that [they] were required to pay" rent.[4]

Based on these allegations, the tenants asserted causes of action against 5110 Washington for (1) violating Los Angeles Municipal Code sections 151.05 and 151.10, which require units to be registered and prohibit the collection of rent for unregistered units; (2) violating California's habitability statute (Civ. Code, § 1942.4); (3) tortious breach of the warranty of habitability; (4) private nuisance, based on maintaining the

---

4    The July, October, November and December 2020 demands to pay rent all occurred after the renewed policy period expired, and thus are outside the policy.

7

"defective conditions" that injured the tenants' health and safety and interfered with their "comfortable enjoyment" of the units; (5) negligence, based on breach of the duty to "maintain [the] premises in a safe, healthy and habitable condition," the breach of which also constitutes a breach of the duties "to refrain from interfering with [the tenants'] full use of and quiet enjoyment of the[] premises," "to comply with all applicable state and local laws" governing their "rights as tenants," and "not [to] obstruct [the tenants'] full use and occupancy of the rented premises"; and (6) violating California's unfair competition law by operating the apartments while they were unpermitted and "in violation of law." The tenants sought at least $5 million in damages.

### D. *Denial of tender of defense and indemnity*

5110 Washington twice tendered the tenants' lawsuit to Scottsdale for defense and indemnity under the policy. Scottsdale denied coverage both times.[5]

Without Scottsdale's assistance, 5110 Washington defended the tenants' lawsuit, and ultimately settled it.[6]

## II. Procedural Background

### A. *Complaint*

5110 Washington filed this action against Scottsdale in April 2023. In the operative first amended complaint, 5110 Washington alleged causes of action for (1) breach of the policy and (2) breach of the implied covenant of good faith and fair

---

[5] Scottsdale's denial of coverage is not in the record.

[6] The terms of that settlement are not in the record.

8

dealing.[7] It sought at least $3 million in damages for the "costs, fees, settlement expenses and other economic and consequential damages" incurred due to Scottsdale's refusal to defend it in the tenants' lawsuit.

## B. *Demurrer*

Scottsdale demurred to the original complaint. In its order sustaining that demurrer, the trial court "'compar[ed] the allegations of the [tenants'] complaint with the terms of the [insurance] policy'" and found that "the underlying [tenants'] action fell within the Policies' Habitability Exclusion." The court also found that the exclusion was "'conspicuous, plain and clear.'" The court rejected 5110 Washington's argument that the exclusion's "mixed action" provision was relevant because the tenants' case was "a breach of habitability case"—and nothing more. The court nevertheless granted 5110 Washington leave to amend.[8]

After 5110 Washington filed its first amended complaint, Scottsdale again demurred, arguing that it owed no duty to defend 5110 Washington against the tenants' lawsuit because (1)

_____

[7] 5110 Washington also brought a cause of action for violation of the unfair competition law claim against Scottsdale, but voluntarily dismissed it.

5110 Washington also asserts causes of action for insurance malpractice and breach of fiduciary duty against the insurance agency, its individual agent, and the brokerage who sold it the Scottsdale policy. Those parties and claims are not before us.

[8] 5110 Washington had asserted a cause of action for negligence against Scottsdale in the original complaint, and the trial court sustained the demurrer to that cause of action without leave to amend. That ruling is not challenged on appeal.

9

the tenants had asserted liability based on 5110 Washington's intentional conduct, which was not an "accident" for purposes of a covered "occurrence" under the policy, and (2) the habitability exclusion "conclusively negate[d]" coverage. Following receipt of an opposition by 5110 Washington as well as Scottsdale's reply, and a hearing, the trial court sustained the demurrer without leave to amend, adhering to the reasoning in its original demurrer and finding that 5110 Washington's additional allegations were "legal conclusions or argument" interpreting the policy rather than facts.[9]

### C. *Appeal*

Following an order of dismissal of Scottsdale, 5110 Washington timely filed this appeal.

## DISCUSSION

In assessing the trial court's ruling sustaining the demurrer to 5110 Washington's complaint without leave to amend, "we ask two questions: (1) Was the demurrer properly sustained; and (2) Was leave to amend properly denied?" (*Shaeffer v. Califia Farms, LLC* (2020) 44 Cal.App.5th 1125, 1134.) The first question requires us to examine the operative complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory. (*John's Grill, Inc. v. The Hartford Financial Services Group, Inc.* (2024) 16 Cal.5th 1003, 1013 (*John's Grill*); *Musso & Frank Grill Co., Inc. v. Mitsui Sumitomo Ins. USA Inc.* (2022) 77 Cal.App.5th 753, 756; Code Civ. Proc., § 430.10, subd. (e).) Because 5110 Washington offers no argument that it should be entitled to

---

[9] Scottsdale had also filed a motion to strike which the court denied as moot, but that motion is not in the record.

amend the complaint, we focus solely on the viability of the claims as alleged.

## I.    Governing Legal Principles

### A.    *Law governing interpretation of insurance policies*

Insurance policies are contracts.  (*John's Grill*, *supra*, 16 Cal.5th at p. 1013.)  As a result, we interpret them by starting with the default rules of contract interpretation—as pertinent here, (1) the overarching goal is to give effect to the parties' mutual intention, which is best reflected in the "'clear and explicit'" language of the contract (*ibid*.; *Montrose Chemical Corp. v. Superior Court* (2020) 9 Cal.5th 215, 230; Civ. Code, § 1636), (2) we use the ordinary meaning of words in a contract (*John's Grill*, at p. 1013), and (3) we read those words in the context of the contract as a whole (*John's Grill*, at p. 1013; *Buss v. Superior Court* (1997) 16 Cal.4th 35, 45 (*Buss*)).

But insurance policies have "special features" that require us to tweak the default rules of contract interpretation.  (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264.)  Specifically, if a policy provision is ambiguous—that is, if it is susceptible to two or more reasonable interpretations—we construe it to effectuate the "objectively reasonable expectations *of the insured*." (*John's Grill*, *supra*, 16 Cal.5th at p. 1014; *Buss*, *supra*, 16 Cal.4th at p. 45; *Minkler v. Safeco Ins. Co. of America* (2010) 49 Cal.4th 315, 321, italics added.)  Applying this principle, we read grants of coverage broadly, but exclusions from coverage narrowly.  (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 16 (*Waller*).)

Like any contract, we interpret an insurance policy de novo. (*Yahoo Inc. v. National Union Fire Ins. Co. etc.* (2022) 14 Cal.5th

11

58, 67; *24th & Hoffman Investors, LLC v. Northfield Ins. Co.* (2022) 82 Cal.App.5th 825, 833 (*24th & Hoffman*).)

**B.** *Law governing an insurer's duty to defend*

Standard commercial general liability insurance policies, like the policy at issue here, at their "core" obligate the insurer both (1) "to indemnify the insured" for damages that the insured is found liable to pay to third parties, and (2) to defend the insured during the proceedings initiated by those third parties to obtain those damages. (*Buss*, *supra*, 16 Cal.4th at pp. 45-46; *Hartford*, *supra*, 59 Cal.4th at pp. 286-287.) An insurer's duty to indemnify—that is, to pay the insured for damages—is triggered only after "'the insured's underlying liability is established'" (that is, at or near the end of a third party's lawsuit against the insured). (*Hartford*, at p. 287.) But an insurer's duty to defend is necessarily triggered "at the very outset of a case" because the very purpose of the duty to defend is to provide a defense to the third party's lawsuit in order to prevent the insured's underlying liability from being established. (*Ibid*.) As a result, while the duty to indemnify turns on whether the damages imposed are a covered loss under the terms of the policy, the duty to defend turns on whether the damages sought in the third party's lawsuit are "potential[ly]" a covered loss under the terms of the policy (that is, whether there is a "potential for indemnity [to the insured] under the insurance policy"). (*Ibid*.; *Scottsdale Ins. Co. v. MV Transportation* (2005) 36 Cal.4th 643, 654 (*Scottsdale*).)

In assessing whether an insurer has a duty to defend its insured, a court must assess whether there is a potential for liability to the third party against the insured by "compar[ing]" (1) the terms of the insurance policy at issue to (2) the factual allegations in the third-party's complaint as well as the extrinsic

12

facts the insurer knows or becomes aware of from any source. (*Hartford, supra*, 59 Cal.App.4th at p. 287; *24th & Hoffman, supra*, 82 Cal.App.5th at p. 834; *Scottsdale, supra*, 36 Cal.4th at p. 654; *Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076, 1081; *Delgado v. Interinsurance Exchange of Automobile Club of Southern California* (2009) 47 Cal.4th 302, 308; *CNA Casualty of California v. Seaboard Surety Co.* (1986) 176 Cal.App.3d 598, 606.)  In examining the third party's complaint, what matters are the "facts contained in the complaint" and whether they create a potential for liability under the policy; the "technical legal cause of action" pleaded or which facts "predominate" in the complaint are not dispositive.  (*CNA*, at p. 606; *Horace Mann*, at p. 1084.) Any doubt as to whether there is a potential for coverage "'must be resolved in favor of the insured.'"  (*Hartford*, at p. 287; *Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 299-300.)  That being said, the duty to defend is "not unlimited." (*Waller, supra*, 11 Cal.4th at p. 19; *Buss, supra*, 16 Cal.4th at p. 47.)  "[I]f, as a matter of law, neither the complaint nor the known extrinsic facts indicate any basis for potential coverage," there is no duty to defend and a request for coverage may be denied.  (*Scottsdale*, at pp. 655, 657; *Stellar v. State Farm General Ins. Co.* (2007) 157 Cal.App.4th 1498, 1504.)

If a court determines that there is a potential basis for coverage as to *any* claim in a third party complaint, the insurer's duty to defend is triggered *as to the third party complaint "in its entirety"*—even if there is no potential coverage as to other claims in that complaint—subject to the insurer having the right to seek reimbursement for any claims for which liability is not ultimately imposed (and hence indemnity not ultimately owed).  (*24th & Hoffman, supra*, 82 Cal.App.5th at pp. 836-837, italics added;

13

*Buss*, *supra*, 16 Cal.4th at pp. 49-50.) Because this principle governing "mixed actions" by third parties goes beyond what is required by the insurance policy itself, this broader duty to defend exists as a matter of public policy (rather than a matter of contract). (*Buss*, at pp. 48-50; *State Farm General Ins. Co. v. Mintarsih* (2009) 175 Cal.App.4th 274, 283.)

## II. Analysis

The trial court correctly dismissed 5110 Washington's cause of action for breach of contract (and its derivative claim for breach of the implied covenant of good faith and fair dealing) because, as a "matter of law, neither the complaint nor the known extrinsic facts indicate any basis for potential coverage." (*Scottsdale*, *supra*, 36 Cal.4th at pp. 655, 657; accord, *Gordon v. Continental Casualty Co.* (2024) 107 Cal.App.5th 89, 109 [no breach of contract or breach of the implied covenant where there is no potential for coverage and hence no duty to defend].)[10]

Because there are no extrinsic facts, our analysis focuses on whether the allegations in the tenants' complaint indicate any basis for potential coverage under the terms of 5110 Washington's policy.

As we explain, they do not. The first three causes of action in the tenants' complaint—for violating the L.A. Municipal Code, for violating California's habitability statute, and for tortious breach of the warranty of habitability—are wholly premised on

---

**10** Harma Hartouni, the only member of the 5110 Washington LLC, was an additional plaintiff alleging the same two causes of action. However, our analysis applies with equal force to Hartouni, even if we assume for purposes of argument that he is an "insured" under the policy. We thus have no need to analyze the parties' contentions as to whether he is, in actuality, an "insured."

the complex being unregistered and/or filthy, which satisfy the policy's definition of habitability (namely, that the premises be "maintained in a sanitary, healthy, habitable, tenantable, livable or usable condition" and be "safe and/or fit for occupancy by human beings"). The fourth cause of action for private nuisance turns on 5110 Washington's allowing the "defective conditions" to exist, which are the same conditions resulting in its uninhabitability. The fifth cause of action for negligence is similarly based on the breach of the duty "to maintain [the] premises in a safe, healthy, and habitable condition." And the sixth cause of action for unfair competition is wholly derivative. All of the tenants' allegations giving rise to these causes of action fall squarely and wholly outside of potential coverage by 5110 Washington's insurance policy because they all fall squarely and wholly inside the policy's habitability exclusion—which, as noted above, reaches "claims . . . arising out of or in any way related to 'habitability' of" the covered premises.

5110 Washington resists this conclusion with what boils down to five clusters of arguments.[11]

_____

11      5110 Washington's brief elsewhere splices together snippets of case excerpts without any analysis. To the extent this was undertaken in support of arguments for reversal, we disregard them as undeveloped. (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 [""When an appellant . . . asserts [a point] but fails to support it with reasoned argument . . ., we treat the point as waived.'" [Citation.] 'We are not bound to develop appellants' arguments for them. [Citation.] The absence of cogent legal argument . . . allows this court to treat the contention as waived."]; Cal. Rules of Court, rule 8.204(a)(1)(B).)

First, 5110 Washington argues that two of the complaint's allegations provide a potential basis for coverage. It points to the tenants' factual allegation that 5110 Washington "illegally entered the premises." Liability for illegal entry is not covered by the policy: Although the initial policy defined "personal and advertising injury" to include "wrongful entry" and "invasion of the right of private occupancy" a further amendment to the policy superseded this definition and specifically omitted those two grounds. Thus, there is no potential for coverage on that basis. 5110 Washington next points to the tenants' factual allegation that 5110 Washington sent "threatening letters" to the tenants "falsely claiming" they owed rent for the uninhabitable and unregistered dwelling units. There is also no potential for coverage for 5110 Washington's conduct in sending these letters: The letters are relevant only because they demand the payment of rent when such demands are unlawful due to the lack of habitability of the apartments, which means the letters are part and parcel of the issue of habitability—and the habitability exclusion reaches (and thus excludes from coverage) conduct that "aris[es] out of" or "relate[s]" "in any way" to habitability of the premises.

Second, 5110 Washington argues that the habitability exclusion is unenforceable because it is not conspicuous, plain and clear. To be sure, "'any provision that takes away or limits coverage reasonably expected by an insured'" is enforceable only if (1) the exclusion is "conspicuous" within the policy, and (2) the language in the exclusionary clause is "plain and clear." (*John's Grill*, *supra*, 16 Cal.5th at p. 1017; *Alterra Excess & Surplus Ins. Co. v. Snyder* (2015) 234 Cal.App.4th 1390, 1404.) But the habitability exclusion in 5110 Washington's policy satisfies this

16

standard. (See *24th & Hoffman, supra*, 82 Cal.App.5th at pp. 834-835 [holding the same].) The exclusion here is very conspicuous: It appears on its own page, with the heading "THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY," and is followed by text in larger font reading "**HABITAILITY EXCLUSION**" in boldface type. The exclusionary language is also "plain and clear"; it defines "habitability," and even provides concrete examples of the types of claims that are excluded.

Third, 5110 Washington argues that both Scottsdale—and, by extension, the trial court—erred in not considering 5110 Washington's cross-complaint against a subset of the tenants (alleging that *those tenants* created the uninhabitable conditions) when assessing whether the tenants' lawsuit created a potential for coverage under the policy. This argument fails both factually and legally. It fails factually because the record does not indicate that Scottsdale was aware that 5110 Washington had filed a cross-complaint against the tenants at the time it denied the tender; indeed, the cross-complaint in the record was filed nearly two years into the tenants' lawsuit, and 5110 Washington did not allege *when* it tendered the defense to Scottsdale. This argument fails legally because the cross-complaint *also* dealt with habitability (and hence falls under the policy's habitability exclusion), and because an insured's filing of an affirmative action styled as a cross-complaint plays no role in determining whether that insured is entitled to a *defense* under its policy. (See *3250 Wilshire Boulevard Bldg. v. Employers Ins. of Wausau* (1995) 39 Cal.App.4th 1277, 1280.)

Fourth, 5110 Washington argues that any determination that the habitability exclusion applies necessarily implies that

17

there is coverage under the policy in the first place.  This is absurd.  Although a court looking at an insurance policy must first examine the "coverage provisions" before looking at the "exclusion clauses" (*Waller*, *supra*, 11 Cal.4th at p. 16), a court's determination that an exclusion clause applies does not constitute an implicit finding that there is potential coverage:  If it did, exclusion clauses would always be eclipsed, and hence ineffective and meaningless.

Fifth and finally, 5110 Washington raises a panoply of challenges premised on the notion that the tenants' action is a "mixed action" (that is, an action containing some causes of action for which there is no potential coverage and others for which there is).  Based on that premise, 5110 Washington goes on to attack the "mixed action" provision of the policy's habitability exclusion, asserting that it is unenforceable because it (1) runs afoul of our high court's holding in *Buss*, *supra*, 16 Cal.4th 35, that public policy imposes a duty to defend an action in its entirety as long as a part of the action might be covered by a policy; (2) improperly overrides the efficient proximate cause doctrine embodied in Insurance Code section 530; (3) violates public policy (under Civil Code section 1667); (4) renders all grants of coverage in the policy illusory or, at a minimum, ambiguous; and (5) is not plain, clear, and conspicuous.  We need not reach these arguments because their premise—that the tenants' lawsuit can be characterized as a mixed action with some claims potentially covered and some not—is not consistent with our determination that *all* of the tenants' causes of action fall squarely and completely within the habitability exclusion itself without any need to resort to the exclusion's "mixed action" provision.  (But see *24 & Hoffman*, *supra*, 82 Cal.App.5th at pp.

839-840 [enforcing similar mixed action provision (and calling it a "catchall" provision)].)

## DISPOSITION

The order is affirmed.  Scottsdale is entitled to costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, P. J.

HOFFSTADT


We concur:


_____, J.

BAKER


_____, J.

MOOR